UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| ERRICK SHELTON, | Case No. 1:09-CV-00439 |
| Petitioner, | Judge Patricia A. Gaughan |
| vs. | **REPORT AND RECOMMENDATION** |
| | **OF MAGISTRATE JUDGE** |
| EDWARD SHELDON, WARDEN, | (resolving ECF #1) |
| Respondent. | Magistrate Judge James S. Gallas |

Errick Shelton has petitioned this Court for habeas corpus relief pursuant to 28 U.S.C. §2254. Petitioner was convicted in the Cuyahoga County Court of Common Pleas of two counts of having weapons while under disability, two counts of domestic violence, one count of felonious assault, two counts of felonious assault with one and three-year firearm specifications, two counts of aggravated burglary with one and three-year firearm specifications, one count of improperly discharging a firearm with one and three-year firearm specifications, one count of menacing by stalking with one and three-year firearm specifications, and one count of carrying a concealed weapon.  (Docket #7, Exhibit 3).  Mr. Shelton was sentenced to serve consecutive sentences for a total term of 15 years incarceration. *Id.*

Mr. Shelton appealed his sentence to the Ohio Eighth District Court of Appeals alleging that his conviction was not supported by sufficient evidence and was against the manifest weight of the evidence.  Mr. Shelton also alleged that "[t]he trial court erred by ordering Appellant to serve a consecutive sentence without first considering a concurrent sentence and by making findings not

supported by the record." (*Id.*, Exhibit 5). The conviction and sentence were affirmed on August 2, 2007. (*Id.,* Exhibit 7).

Mr. Shelton did not timely appeal to the Supreme Court of Ohio, but filed a motion for delayed appeal on September 28, 2007, which the Supreme Court granted. (*Id.,* Exhibits 9, 10). In his brief in support of jurisdiction, Mr. Shelton alleged that his sentence violates the remedy set forth in *State v. Foster*, 109 Ohio St.3d, 1, thereby violating the ex post facto and due process clauses of the United States Constitution. (*Id.,* Exhibit 11). Mr. Shelton also alleged that "[t]rial courts do not have the authority to impose consecutive sentences." *Id.* On March 28, 2008, the Supreme Court denied Mr. Shelton leave to appeal. (*Id.*, Exhibit 13).

Mr. Shelton timely filed the instant petition on February 26, 2009, under 28 U.S.C. §2254, and presents two grounds for relief:

> **Ground for Relief No. 1**: Defendant's sentence is not supported by law and is contrary too [sic] law. State v. Foster does violate the ex-post facto and due process clause of the Constitutions of the United States and Ohio. Foster also violates the separation of powers. (Docket #1 at 5).
>
> **Ground for Relief No. 2**: Trial courts do not have the authority to impose consecutive sentences. (Docket #1 at 6).

Respondent answered opposing the petition (Docket #7). Mr. Shelton did not file a traverse.

### I. *FACTUAL BACKGROUND*

The facts that formed the basis of the Mr. Shelton's conviction were set forth in *State v. Shelton,* 2007 WL 2200486 (Ohio App. 8 Dist.), at ¶¶4-42 ("State Court Decision").

> The state called Janiera Levert ('Janiera') first to testify. She lives on the southeast side of Cleveland with her six children. Janiera stated that Shelton lived with her and her children from September 2004 to June 2005. She further stated, however, that once he moved out, Shelton was not welcome in her home and that he no longer possessed a key to her house.FN1

3

> FN1. Janiera identified Shelton in court.

Janiera testified that on the day in question, August 22, 2005, Shelton followed her, pushed his way into her home, and a fight ensued. She said that Shelton grabbed her hair and pulled out about thirty-five micro braids that were 'all the top [of her head].' Next, he bit her on the shoulder and she fell to the floor. Shelton then left her home. Janiera also testified that two of her children, M.L. and Do.L., her niece, T.L., and her nephew were also involved in the fight.FN2 Janiera stated that the wound on her shoulder was, 'like, real open and you could tell there was teeth marks, but it was like my bone right here was kind of open and it was just like a bite mark.' She also testified that her head 'felt like somebody was just pulling it from the roots and [her] shoulder was burning and just sore.'

> FN2. Because the children are minors their full names are not given.

Two days later, on August 24, 2005, Janiera was sitting on her front porch when Shelton pulled up in front of her house in a 1996 rusty-orange Cavalier. She recognized the vehicle because Shelton had originally bought it for her, but had taken it back two days earlier. He said, '[c]ome here, bitch' and she replied, '[n]o.' He then stated, '[y]ou better not be here when I get back.' Janiera went inside her house because she was scared.

Her niece came into the house 'real fast' and Janiera ran to the basement. Janiera heard Shelton say, '[w]here that bitch at?' When she was in the basement, she heard a loud 'pow' from a gun and debris fell on her head 'real fast like the bullet.' She also testified that the bullet passed by the top of her head 'real close' and that she 'could feel the wind.' Janiera did not see the gun. When she came up from the basement, the police were at her house.

Next, Janiera testified that early in the morning on August 25, 2005, she was sleeping in her bed and woke up to a noise. She called the police.

On cross-examination, Janiera acknowledged that she had told defense counsel prior to trial that she never saw Shelton shoot a gun on any of the days in question. She further agreed that she never saw Shelton in her basement on August 22, 2005, or saw him on August 25, 2006.

The state then presented thirteen-year-old Do.L., who is Janiera's daughter. She testified that on August 22, 2005, she tried to get Shelton off of her mother. Do.L. said that Shelton bit her on the wrist which caused a cut. She then went to her grandmother's house and called the police.

She stated that on August 24, 2005, she was looking out her bedroom window and saw Shelton walk up to the house. She did not see anything in Shelton's hands, but

4

said, '[a]s soon as he walk in the house, that's when I heard it.' The prosecutor asked, '[w]hat did you hear?' Do.L. replied, 'a gunshot.'

On cross-examination, Do.L. said that on August 22, 2005, Shelton was already inside of the house when Janiera went into the house. During the fight, neither Janiera nor Shelton fell or got pushed to the floor. She also stated that the fight lasted a couple of minutes.

M.L., who is fourteen years old, testified after Do.L. M.L. stated that on August 22, 2005, she witnessed Shelton grab her mother's hair, bite her mom on the shoulder, and bite Do.L. M.L. then called the police. Shelton left before the police arrived.

M.L. said that on August 24, 2005, she saw Shelton come inside her house, load a gun, and walk into the kitchen. She then heard a gun shot. She described the gun as being black, not small and not big. She then made an in-court identification of the gun.

M.L. testified that on August 25, 2005, she was in her room when she looked out her window and saw Shelton in front of the house. She saw him pull a gun from his waistband, aim it at her mother's room, and shoot it.

On cross-examination, M.L. stated that on August 22, 2005, Shelton was already inside her house when Janiera got home. During the fight, Janiera was on the floor. She also testified that the fight lasted forty minutes. M.L. agreed that she never actually saw Shelton shoot the gun on August 24, 2005 or on August 25, 2005, but rather, saw Shelton point the gun 'close by my mom's room' and then heard a shot. She also said that Janiera was in that bedroom.

The next witness to testify was T.L. She is sixteen years old. Janiera is her aunt and T.L. lived with her from June 2005 to August 24, 2005. T.L. was present during the August 22, 2005 and August 24, 2005 events and confirmed Janiera's version of what occurred those days.

T.L. said that on August 24, 2005, Shelton pulled up to Janiera's house in a red vehicle. She testified that Shelton had a gun, pulled the slide back, and put it in his pants. T.L. said that she then went into the kitchen and said to Janiera, '[y]ou better run, because [Shelton is] coming with a gun.' T.L. ran out the back door and heard one gunshot.

On cross-examination, T.L. testified that on August 22, 2005, Janiera had been inside the house when Shelton arrived. She further said that the physical fight lasted twenty minutes.

5

D.F. testified after T.L. He is fifteen years old. He stated that on August 24, 2005, Shelton came to Janiera's house in a burgundy Cavalier. He saw Shelton cock a gun and go inside the house. He then heard a gunshot.

D.F. further testified that on August 25, 2005, a friend drove him home and dropped him off at his house. He saw Shelton walk down a side street 'cut' that was near his house. D.F. then went inside his house to lie down. He later heard a gunshot. Janiera called the police.

On cross-examination, he stated that he never saw Shelton's Cavalier on August 25, 2005. He also did not see Shelton after he walked down the 'cut' or see him fire a gun that night.

The state then called sixteen-year-old De.L. to testify. He is Janiera's son. On August 24, 2005, he was sleeping on a couch in the living room when he awoke and saw Janiera and T.L. run through the house. He then saw Shelton enter the living room and drop bullets on the ground. De.L. testified, '[Shelton] grabbed the gun he had in his hand and was fumbling with the clip of the gun.' De.L. then saw Shelton, 'put the clip in the gun and he walked toward the kitchen. He cocked the gun back and he aimed it towards the floor, like he knew directly where he was pointing it to and he shot.' De.L. went to a store and asked someone to call 9-1-1. He then described the gun as black and made an in-court identification of it. De.L. also stated that on August 25, 2005, between 1:00 a.m. and 3:00 a.m., he heard a gunshot.

The state then presented Adrienne Slaughter ('Adrienne'), Janiera's cousin, as its next witness. On August 24, 2005, she was at her home located at 4061 East 139th Street, Cleveland, Ohio. She was in her basement all day braiding hair for customers. She testified that Shelton came over her house earlier that day. She stated, 'I guess he was sleeping upstairs, because I was busy downstairs doing hair.'

Later that night, Adrienne said that Shelton told her that he had to go to his mother's house to get money. Shelton drove the Cavalier while Adrienne sat in the passenger seat. Shelton parked the Cavalier at 103rd Street and Harvard Avenue. He said, 'I'm going to park right here so I could go to my mom's house. I don't want to chance Janiera seeing the vehicle.'

Adrienne called Shelton's cell phone when he did not return quickly. She testified that he said, '[I'm] coming, [I] was doing something.' She stated that it was about 1:00 a.m. on August 25, 2005, but she was not certain of the time because it was late. Shelton called her later on her cell phone and said that he was done. She picked him up around 100th Street and Harvard Avenue.

She then saw a light purple Taurus pull behind the Cavalier. Shelton said '[d]on't you see the police behind you? Pull in this driveway.' She stated that she saw Shelton

6

'pull a gun out his back. I thought he got out with the gun, but he obviously dropped it in the passenger seat. * * * And I was getting out [of] the car as he got out to run and everybody said, "Freeze."'

On cross-examination, Adrienne testified that on August 25, 2005, Shelton left the Cavalier for a half hour to an hour, but she was not sure because she was tired.

The next witness to testify was Officer John Ludrosky ('Officer Ludrosky') of the Cleveland Police Department. On August 22, 2005, he was working in a two-man cruiser with Officer Kinas. They received a call to respond to a Harvard Avenue address for a domestic violence situation. When they pulled up to the house, Janiera walked outside, and it looked like she had been in a physical altercation. Her hair was a mess and her shirt was ripped. There were younger children on the scene and everyone was agitated. Janiera had a bite on her shoulder that was red, bleeding, and abraded. She told Officer Ludrosky that her hair had been pulled. Officer Ludrosky said that the male suspect was not on the scene when they arrived.

Next to testify for the state was Detective Michael Belle ('Detective Belle') of the Cleveland Police Department, Crime Scene Investigation Unit ('CSI'). On August 25, 2005, he was on duty when he heard a radio call explaining that a male shot into a habitation on Harvard Avenue and giving the description of a red Cavalier. He then noticed a vehicle that fit the description on Harvard Avenue, near 114th Street, and he reported the location. He followed the vehicle until other officers assisted. He saw the female driver pull into a driveway and the male passenger jump out of the vehicle, but police officers apprehended him. He further stated that he processed the scene.

Detective Belle photographed the vehicle with the gun inside. He believed the gun was on the passenger floor of the front seat. He then made an in-court identification of the gun. He also photographed the residence and recovered evidence. He found a 'spent' shell casing outside, in front of the house, near the sidewalk. He also recovered metal fragments of a suspected bullet that was inside the house on a table. He further testified that he conducted a gunshot residue test on Shelton.

Next, the state called Officer Brian Todd ('Officer Todd') of the Cleveland Police Department to testify. On August 25, 2005, he was working with his partner, Officer David Harris when they heard Detective Belle's radio call and they drove to assist him. Officer Todd corroborated Detective Bell's testimony. He then responded to the Harvard Avenue residence.

Officer Todd testified that he searched the area outside, while his partner went inside to get information from the family. He found a shell casing on the sidewalk in front of the house and marked its location. He stated that Detective Belle came to the scene, took photographs, and recovered the evidence.

Officer David Harris ('Officer Harris') of the Cleveland Police Department testified next. On August 25, 2005, he was working with his partner, Officer Todd. He corroborated Officer Todd's and Detective Belle's testimony. Additionally, he stated that a bullet entered the bedroom window and stopped a few feet away near the wall.

The state then presented Officer Rich Tusing ('Officer Tusing') of the Cleveland Police Department. On August 24, 2005, he was working with his partner, Officer Stone. He received a call to respond to a Harvard Avenue residence because shots had been fired. He arrived five minutes later and began to interview witnesses. He and Janiera located the bullets' point of entry, where the suspect had shot through the kitchen floor. He located a shell casing near the stove in the kitchen. The shell casing was directly to the right of the point of entry. Then, Janiera showed him where she had been hiding in the basement. On cross-examination, he stated that he did not find a bullet in the basement, but said that was not unusual.

Donna Rose of the Ohio Bureau of Criminal Identification and Investigation ('BCI') testified next. She is a forensic scientist and performs gunshot residue testing. She stated that residue gets on someone's hands by discharging or being near a discharged firearm, or handling an item with residue on it. Gunshot residue is easily washed away or rubbed off.

She performed a gunshot residue test on a sample provided by the Cleveland Police Department. In her report, she stated, '[p]articles highly indicative of gunshot primer residue were identified on the left hand and right hand samples of Errick Shelton.'

Detective James Ealey ('Detective Ealey') of the Cleveland Police Department also testified for the state. He works in the technical section of the forensics unit. He performs operability and trigger pull tests on guns, and compares bullets and casings. He stated that he test fired the gun that police retrieved from the Cavalier and determined it was operable. He compared a test fire to the casing retrieved from the scene of the crime and determined that they matched. He also examined a bullet and determined it was fired from the gun retrieved from the Cavalier. He compared a second shell casing and determined it also came from the same gun.

Then, outside the presence of the jury, Shelton orally and in writing waived a jury trial with respect to two counts of having weapons while under disability and all the RVO specifications. The state nolled counts thirteen, fourteen, fifteen, seventeen, eighteen, and nineteen. The state then rested its case.

At the close of the case, Shelton moved for a Crim.R. 29 acquittal, particularly arguing the attempted murder charge. Over the objection of the state, the court granted the Crim.R. 29 motion with respect to the attempted murder charge. Shelton then rested his case.

8

On May 19, 2006, the jury found Shelton guilty of domestic violence, with NPC specifications in counts three and ten; felonious assault in count four; aggravated burglary, with one- and three-year firearm specifications in counts six and seven; felonious assault, with one- and three-year firearm specifications in counts eight and sixteen; improperly discharging firearm at or into a habitation, with one- and three-year firearm specifications in count twelve; menacing by stalking, with one- and three-year firearm specifications in count twenty-one; and carrying a concealed weapon in count twenty-two. Shelton then entered a plea of no contest to having weapons while under disability in counts nine and twenty, and the trial court found him guilty.

## II.    *LAW AND ANALYSIS*

For purposes of federal collateral review, all claims adjudicated on their merits by state courts are governed by 28 U.S.C. §2254(d)(1) and (2), which extends the permissible range of federal review of state convictions as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim - - -
>
> (1) resulted in a decision that was *contrary to*, or involved an *unreasonable application* of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding (emphasis supplied).

A district court has very restricted Congressionally-granted powers for review under 28 U.S.C. §2254(d). See *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000)*; Bell v. Cone*, 535 U.S. 685 (2002). The habeas applicant must show either that the state decision was "contrary to" or an "unreasonable application" of Supreme Court precedent.  The phrases "contrary to" and "unreasonable application" are not the same.   Under the "contrary to" standard of review, the state court's decision is "contrary to" clearly established federal law when it "confronts a set of facts that

9

are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [this] precedent." *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003); *Williams,* 529 U.S. at 405-06; *Mitchell v. Esparza*, 540 U.S. 12, 15 (2003). Under those circumstances the Supreme Court has held that the federal court on habeas review may grant the writ. *Id.* The phrase "clearly established Federal law" refers to holdings, as opposed to *dicta,* of the U.S. Supreme Court at the time of the relevant state court decision. *Lockyer*, 538 U.S. at 71-72; *Williams*, 529 U.S. at 412; *Bell*, 535 U.S. at 698.

Under the "unreasonable application" standard, "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Rompilla v. Beard*, 545 U.S. 374, 380 (2005); *Williams*, 529 U.S. at 413; *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003). This includes both the state court's refusal to extend and/or its unreasonable extension of existing legal principles from Supreme Court precedent to new contexts. See *Williams*, 529 U.S. at 407. The unreasonable application of Supreme Court precedent must, however, be "objectively" unreasonable. *Id.* at 409; *Wiggins,* 539 U.S. at 520-21. When the state court has rendered a decision, the federal reviewing court may not grant the writ in its "independent review of the legal question." *Lockyer*, 538 U.S. at 75. When there has been an "unreasonable application" of clearly established federal law, then no deference is due to the state decision and the federal court is free to resolve the claim independently.

10

With regard to his first ground for relief, [1] Mr. Shelton argued on appeal to the Ohio Supreme Court that because the offenses at issue occurred prior to *Foster*, the remedy set forth in *Foster*, as applied by the trial court, violated the ex post facto and due process clauses of the United States Constitution. [2] (Docket #7, Exhibit 11). Mr. Shelton did not argue this issue to the state appellate court and did not argue that his sentence under *Foster* violated the separation of powers doctrine.

to either the state appellate court or the Supreme Court of Ohio.

With regard to his second ground for relief, Mr. Shelton argued on appeal to the Ohio Eighth District Court of Appeals that, "the trial court did not make the appropriate findings to justify a consecutive sentence and based its decision on conclusions not supported by the evidence without first considering whether a concurrent sentence would be appropriate." (*Id.*, Exhibit 5 at 19). Mr. Shelton's argument to the Ohio Supreme Court vis-a-vis the consecutive sentence imposed was different. There, he argued that when the legislature found judicial fact-finding to be unconstitutional, it "severed the unconstitutional provisions of [O.]R.C. 2929.14 and [O.]R.C. 2929.41 [and] also severed constitutional sentencing law - i.e., the presumption for concurrent prison terms, and the statutory authority to impose consecutive prison terms." (*Id.*, Exhibit 11 at 10).

---

[1] Because both of Mr. Shelton's grounds depend on the same law and analysis, they will be discussed together.

[2] Mr. Shelton's petition did not contain any argument beyond that set forth in his stated grounds for relief. Presumably, his arguments are the same as presented to the Ohio appellate courts.

"A petitioner seeking a writ of habeas corpus must meet certain procedural requirements to permit review of his habeas claims by a federal court." *Murphy v. Ohio*, 552 F.3d 485, 501 (6th Cir. 2009), citing *Smith v. Ohio Dep't of Rehab. & Corr.*, 463 F.3d 426, 431 (6th Cir. 2006). "A federal court will not review claims that were not entertained by the state court due to either the petitioner's failure to raise those claims in the state courts while state remedies were available or the petitioner's failure to comply with a state procedural rule, thereby preventing the state courts from reaching the merits of the claims." (Emphasis added). *Murphy*, 552 F.3d at 501, citing *Lundgren v. Mitchell*, 440 F.3d 754, 763 (6th Cir. 2006). The exhaustion requirement is satisfied "once the federal claim has been fairly presented to the state courts." *Franklin v. Rose,* 811 F.2d 322, 325 (6th Cir. 1987). To "fairly present" a federal constitutional claim to a state court, a petitioner must give the highest court in the state a full and fair opportunity to rule on his claims. *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990). If a petitioner has no remaining state remedies but has failed to present all claims to the highest state court in a federal constitutional context, then petitioner's state remedies are exhausted, but petitioner has procedurally defaulted the claims. *See Simpson v. Sparkman*, 94 F.3d 199, 203 (6th Cir.1996); *Hannah v. Conley*, 49 F.3d 1193, 1195-96 (6th Cir.1995).

"[A] petitioner can overcome the procedural default, [however], by either 'demonstrat[ing] cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrat[ing] that failure to consider the claims will result in a fundamental miscarriage of justice.'" *Jells v. Mitchell*, 538 F.3d 478, 488 (6th Cir. 2008), *quoting Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

With regard to Mr. Shelton's separation of powers argument as contained in his first ground for relief, Mr. Shelton is procedurally defaulted because he did not raise this issue before the state

12

courts and has not attempted to establish cause, prejudice or a fundamental miscarriage of justice.

With regard to the balance of his argument, the State Court Decision affirmed Mr. Shelton's conviction based on the authority of every appellate district in Ohio, and found that "the remedial holding of *Foster* does not violate [appellant's] due process rights or the ex post facto principles contained therein [because] '[Defendant] had notice that the sentencing range was the same at the time he committed the offenses as when he was sentenced." (State Court Decision at ¶70, *quoting State v. Mallette*, 2007 WL 530187 (Ohio App.8 Dist.)). Moreover, "*Foster* did not judicially increase the range of his sentence, nor did it retroactively apply a new statutory maximum to an earlier committed crime, nor did it create the possibility of consecutive sentences where none existed." *Id.* The appellate court further noted that "every other appellate district in the State of Ohio has reached the same conclusion." *Id.* (Citations omitted).

On the issue of the imposition of consecutive sentences post-Foster, and the impact of *Foster* on the due process and ex post facto provisions of the Constitution generally, this District, in *Semala v. Duffey,* determined, when considering the same arguments at issue here that:

> Petitioner Semala does not assert that she was unaware of the potential sentence she faced or that the sentence she did receive is in excess of what Ohio law dictated at the time of the original sentence or re-sentence. Indeed, Semala's sole argument is that her consecutive sentence is unconstitutional because it was imposed utilizing the analysis in Foster even though she was convicted before Foster. In addition, she fails to show that before Foster, Ohio law stopped the imposition of consecutive sentences in her case, she only shows that it required certain judicial fact-finding. Because the state court of appeals correctly held that Foster does not violate the Ex Post Facto or Due Process Clauses generally or as applied to the facts of Semala's case, and because Semala has not established that the decision of the state court of appeals was contrary to or constituted an unreasonable application of clearly established federal law, the Court must deny Semala's petition for federal habeas relief.

*Semala v. Duffey*, 2009 WL 2515629 (N.D. Ohio)(Gwin, J.).

13

Mr. Shelton has not asserted that he was unaware of the potential sentence that could have been imposed or that the sentence he received was in excess of what Ohio law dictated at the time of the original sentence. As in *Semala,* because the state appellate court addressed these issues correctly, Mr. Shelton has not established that the state court decision is contrary to or constituted an unreasonable application of clearly established federal law.

### III.  *CONCLUSION AND RECOMMENDATION*

Following review of the arguments raised in the petition and applicable law, petitioner has not demonstrated that she was in custody pursuant to state court judgment that resulted from a decision that is "contrary to" or involved in an "unreasonable application" of federal law as determined by the Supreme Court of the United States.  See 28 U.S.C. §2254(d)(1).  Further, there has been no demonstrated need for an evidentiary hearing and the petition for habeas corpus relief under 28 U.S.C. §2254 should be denied and dismissed.

      /s/James S. Gallas  
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of mailing of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See*, *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).

Dated: October 27, 2009